**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Sylvia Bayley, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 1:13-cv-02 |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| MDU Resources Group, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Sylvia Bayley ("Bayley") brought this action against defendant Montana Dakota

Utilities Resources Group, Inc. ("MDU") for age discrimination, defamation, retaliation, and

breach of employment contract[1] related to the involuntary termination of her employment with

MDU. (Doc. #1). MDU filed a motion for summary judgment. (Doc. #28). The motion for

summary judgment has been fully briefed by the parties.

### <u>Summary of Recommendation</u>

The defendant is entitled to summary judgment on all claims. (1) Bayley's age

discrimination claim fails because her age was not the "but for" cause of her involuntary

employment termination; (2) her defamation claim fails because there is no evidence MDU's

alleged defamatory matter was communicated to a third party; (3) Bayley's retaliation claim fails

because MDU's conduct about which she complained was not a violation of federal or state law;

and (4) her breach of contract claim fails because she did not have an employment contract with

MDU. Therefore it is **RECOMMENDED** defendant's motion for summary judgment (Doc.

#28) be **GRANTED** and Bayley's complaint (Doc. #1) be **DISMISSED** with prejudice.

---

[1] Bayley also alleged sexual harassment and hostile work environment against MDU but
those claims were dismissed. (<u>See</u> Order, Doc. #25).

## Factual Background

MDU hired Bayley to work in corporate accounting within the Resources Department on January 2, 1990. (Bayley's Dep., Doc. #30-1, pgs. 16-17). On November, 20, 2002, Randy Watson ("Watson"), the General Tax Supervisor, offered Bayley a Tax Analyst III position with MDU. (Employment Offer Letter, Doc. 30-7). The offer of employment letter stated, "[T]his is not a contract of employment for any specified period of time. The employment relationship can be terminated by you or the Company at any time, for any reason, with or without notice." Id.

In Bayley's 2009-2010 Performance Review, Watson noted that Bayley's work "would improve if she held herself accountable to a higher standard of excellence" and that she "sometimes fails to manage her time efficiently." (Bayley's 2009-2010 Performance Review, Doc. #30-9, p. 3). Further, Watson stated Bayley needed to "[f]ocus on improving the quality of [her] work. Try to eliminate errors, particularly on work done with the corporate plan." Id. at 4. Although Bayley signed the Performance Review, she expressed disagreement with the assessment by crossing out the critical comments regarding time management and accountability and providing her own explanation for those statements.[2] Id. at p. 5. In Watson's Performance Review for that same year, his supervisor Richard Holland ("Holland") stated, "Randy needs to work with Sylvia to make her understand her rol[e] in the Department. Sylvia needs to improve her performance and accuracy on her projects. This is an opportunity for Randy to be a teacher to Sylvia." (Watson's 2009-2010 Performance Review, Doc. #30-10, p. 4). Holland went on to note

---

[2] Specifically regarding the category of "Achievement Focus" Bayley wrote, "I believe the wording is misleading. Randy Watson informed me the software populates the words based on his rating so those were not his words." (Bayley's 2009-2010 Performance Review, Doc. #30-9, p. 5). Concerning "Planning & Organization" Bayley wrote, "I do not agree with this statement and feel work requires overtime hours due to workload, not time management." Id.

in Watson's review, "During the course of the year I will be watching Randy and Sylvia to see if he is working with her to improve her performance." Id.

On May 3, 2011, Watson, Holland, Bayley and another MDU tax employee named Lauri Wavra ("Wavra") met to discuss reassigning work responsibilities from Wavra to Bayley. (Bayley's Dep., Doc. #30-2, p. 21, lns. 15-22; Watson's Dep., Doc. #44-2, p. 17, lns. 13-16). Wavra was a part-time employee, while Bayley was full-time. (Bayley's Dep., Doc. #30-2, p. 23, lns. 6-7). Bayley accepted the additional responsibilities without complaint but stated in her deposition that she thought it was "shocking" and "unfair" because she "had been taking on additional workload of [Wavra's] when [Wavra] started part-time and I just continued to get more." (Bayley's Dep., Doc. #30-2, p. 23, lns. 15-20). Watson explained the reallocation of responsibilities as follows:

> We were looking at duties for the – for my staff and one of the things that Rick [Holland] suggested was to put together a list of duties and then rank them based on difficulty just to see how even the workload [between Wavra and Bayley] was, and out of that it was discovered that Lauri's workload was quite a bit higher than Sylvia's at the time so we shifted some duties to even things out.

(Watson's Dep., Doc. #44-2, pgs. 17-18). After the meeting on May 3, 2014, Watson sent Bayley an email on May 4, 2011, regarding the increase in her workload and stated,

> I also want to emphasize my expectations regarding these and all your duties as a Tax Analyst III. I know we have talked about improving the accuracy of your work during your performance reviews and I want you to continue with those efforts. This is even more important now that you have added responsibilities. Concentrating on the quality of your work means that you won't need to spend time redoing returns or making corrections. This will save me time as well. Take your time, do self reviews, and if you have a problem or a question about something, please just ask. I would much rather clear up issues on your projects as they come up, it saves everyone's time.

(Watson's May 4, 2011, Email to Bayley, Doc. #30-12).

As part of the redistribution of responsibilities, Bayley began handling the tax payments for Cascade, a newly acquired client from Washington. (Cascade Emails, Doc. #30-13, pgs. 2-3).

Bayley thought MDU's procedure for tax payment[3] was "very inefficient, a waste of company time or resources" and therefore sought to change the process. (Bayley's Dep., Doc. #30-2, p. 35, lns. 10-11; Bayley's Cascade Emails, Doc. #30-16, pgs. 2-3). Holland objected to Bayley's proposed modifications[4] and ultimately the process remained unaltered. (Holland's Dep., Doc. #44-4, pgs. 61-62; Bayley's Cascade Emails, Doc. #30-16, pgs. 2-3). Bayley acknowledged that MDU's procedure in place for Cascade payments was not illegal. (Bayley's Dep., Doc. #30-5, pgs. 3-4).

Watson, Holland, and HR Generalist Bonnie Taylor ("Taylor") corresponded in mid-October about placing Bayley on a Performance Review Plan ("PIP"). (PIP Emails, Doc. #30-17, p. 2). On November 2, 2011, Watson, Holland, and Taylor presented Bayley with a PIP which stated *inter alia* Bayley was "not meeting the expectations of the Tax Analyst III position . . . evidenced by the number of errors made on [Bayley's] day to day work product." (Bayley's PIP, Doc. #30-18, p. 2). Specifically, the PIP noted Watson had a file containing 71 errors Bayley made dating back to January 2011.[5] Id. Bayley signed the PIP and was placed on review from November 2, 2011 through December 1, 2011. Id. at 2-3. On December 5, 2011, Bayley received a memo acknowledging her successful completion of the PIP but reminding her, "Please

_____

[3] MDU's tax payment procedure required Cascade's approval of the checks, then Bayley's approval, and finally Rick Holland's approval before issuance. (Holland's Dep., Doc. #44-4, pgs. 58-59).

[4] According to Holland, he objected to Bayley's proposed alterations because "[c]hecks were being requested by tax department personnel, and Sylvia's process change would be that nobody within the tax department, besides Sylvia, would see what those requests were and have an opportunity to review them and make sure of their accuracy." (Holland's Dep., Doc. #44-4, pgs. 61-62).

[5] The PIP further elaborated that 39 of the 71 errors were made during Bayley's work on the annual planning project which had been her responsibility for the previous nine years. (PIP Emails, Doc. #30-17, p. 2).

remember, you are expected to maintain this level of performance to meet the expectations of the Tax Analyst III position and if you do not, further disciplinary action up to and including termination will be taken." (Dec. 5, 2011 PIP Memo, Doc. #30-19, p. 2). According to Watson, Bayley did not commit any errors during her thirty-day PIP review but he states "after the end of that period there was a couple more errors that we discovered . . . ." (Watson's Dep., Doc. #44-2, p. 13). Bayley maintains she was not informed of any errors she had made after completing the PIP. (Bayley's Dep., Doc. #30-4, p. 42, lns. 4-8).

Watson supervised Bayley from 2002 until December 19, 2011. (Watson's Dep., Doc. #44-2, p. 9, lns. 7-9). On that date at a staff meeting, Holland announced to the tax department that he was assuming direct supervision over the entire department, so he became Bayley's direct supervisor at that time. (Holland's Dep., Doc. #44-4, pgs. 25-26). According to Holland, his explanation to the department for the reorganization was that he wanted cross-training between the two departments because he was concerned that the tax department would lack business knowledge if Watson, Wavra, and Bayley all happened to retire around the same time. (Holland's Dep., Doc. #44-4, pgs. 26-27). Bayley submits that Holland noted her, Watson's, and Wavra's ages were over 50 during his explanation. (Bayley's Dep., Doc. #30-3, p. 46, lns. 9-14; Bayley's Dep., Doc. #30-4, p. 44, lns. 2-6).

Some time after the meeting, Watson prepared Bayley's annual Performance Review from November 17, 2010 to December 31, 2011, and presented it to Taylor as required by MDU procedure because Bayley had been on PIP. (Taylor's Dep., Doc. #44-5, pgs. 23-24). According to Taylor, she made suggestions to Watson to lower several of Bayley's ratings from proficient to marginal in order to encompass Bayley's performance over the entire year instead of just the month following Bayley's completion of the PIP. Id. at pgs. 25-26. In their depositions, Taylor

and Holland testified that part of Taylor's job responsibilities entailed providing input to MDU supervisors regarding proper evaluation techniques for Performance Reviews based on information from the supervisors. (Taylor's Dep., Doc. #44-5, pgs. 25-27; Holland's Dep., Doc. #44-4, pg. 40, lns. 5-15). After receiving the 2010-2011 Performance Review, Bayley prepared a document with questions concerning the review for Holland. (Bayley's Performance Review Questions, Doc. #39-17, pgs. 1-2). On January 11, 2012, Holland and Taylor informed Bayley they would not respond to the questions she had submitted and that she was not required to sign the 2010-2011 Performance Review. (Bayley's Dep., Doc. #30-4, pgs. 2-3). Bayley did not sign the Performance Review. (2010-2011 Performance Review, Doc. #30-23, p. 3). According to Holland, he left the Performance Review dated January 13, 2012, face down on Bayley's chair and pushed the chair under her desk in her cubicle. (Holland's Dep., Doc. #44-4, p. 70). Although Bayley notes she shared a cubicle with five other people and another 150 employees could have accessed the Performance Review left on her chair (Doc. #39-1, p. 2), Bayley admits she has no actual evidence anyone other than herself, Holland, and Watson saw the Performance Review. (Bayley's Dep., Doc. #30-3, p. 51, lns. 2-4; Bayley's Dep., Doc. #30-4, p. 4, lns. 15-17).

MDU terminated Bayley's employment on January 18, 2012, when Bayley was 52 years old. (Doc. #1; Termination Notice, Doc. #30-24, p. 2). The Termination Notice provided to Bayley stated she was terminated because her "work product ha[d] not met the minimum requirements for [her] position" and since the time she successfully completed the PIP she "failed to sustain an acceptable level of job performance, as explicitly called for in the PIP." (Termination Notice, Doc. #30-24, p. 2). After Bayley was involuntarily terminated, MDU hired Amber Peltier ("Peltier") around February 2012. (Watson's Dep., Doc. #44-2, p. 31, lns. 4-8).

Peltier had been an intern at MDU and was a recent college graduate in her twenties. (Taylor Dep., Doc. #44-5, p. 41, lns. 21-25; Holland's Dep., Doc. #44-4, p. 65, lns. 22-23). Bayley asserts she had 22 years of successful employment with MDU and that Peltier had "no experience" and was hired as her younger "replacement." (Bayley's Affidavit, Doc. #37-2, pgs. 1, 7, 27, 28). Taylor submits Peltier was not a replacement for Bayley because Peltier was hired at an entry-level position and had different job duties than Bayley. (Taylor's Dep., Doc. #44-5, p. 42, lns. 1-19). Holland and Watson further state that Bayley's duties were split among Watson, Wavra, and Peltier after Bayley was terminated and therefore Peltier was not fully a replacement for Bayley's position. (Holland's Dep., Doc. #44-4, pgs. 64-65; Watson's Dep., Doc. #44–2, pgs. 31-32).

## Legal Standard

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is "material" if it might affect the outcome of a case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex, 477 U.S. at 322.

The burden is on the moving party to establish the basis for its motion. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). If the moving party has supported its motion for summary judgment, the nonmoving party has an affirmative burden to go beyond the pleadings and show a genuine triable issue of fact. Commercial Union Ins. Co. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992). The court views the facts in the light most favorable

to the nonmoving party, who enjoys "the benefit of all reasonable inferences to be drawn from the facts." <u>Vacca v. Viacom Broadcasting of Missouri, Inc.</u>, 875 F.2d 1337, 1339 (8th Cir. 1989) (citation omitted).

**<u>Discussion</u>**

**1. Age Discrimination**

Bayley asserts she had 22 years of successful employment at MDU until "Holland decided he wanted a younger person in [her] position." (Bayley's Affidavit, Doc. #37-2, p. 1). In order to prove a claim of age discrimination under the Age Discrimination in Employment Act ("ADEA"), a plaintiff "must show, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." <u>Haigh v. Gelita USA, Inc.</u>, 632 F.3d 464, 468 (8th Cir. 2011) (citing <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 129 S. Ct. 2343, 2352, (2009); 545 F.3d 639, 642 (8th Cir. 2008)). Specifically, Bayley must demonstrate: (1) she was at least 40 years old; (2) her employment was terminated; (3) she was meeting her employer's reasonable expectations at the time she was terminated; and (4) she was replaced by an individual who was substantially younger. <u>Haigh</u>, 632 F.3d at 468 (citing <u>Roeben v. BG Excelsior Ltd. Partnership</u>, 545 F.3d 639, 642 (8th Cir. 2008)). If Bayley meets each of these four elements, the burden of proof shifts to MDU to provide a legitimate, non-discriminatory reason for Bayley's termination. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Roeben</u>, 545 F.3d at 642. If MDU provides a sufficient justification, the burden shifts back to Bayley to provide that MDU's proffered reason was pretext for age discrimination. <u>McDonnell</u>, 411 U.S. at 802-03; <u>Roeben</u>, at 642-43. It is undisputed the first two elements have been met. (<u>See</u> Doc. #1; Termination Notice, Doc. #30-24, p. 2).

Bayley contends she "had a stellar history at MDU. She had no reprimands, no suspensions and was held in high regard by her co-workers." (Doc. #39-1, pgs. 13-14). MDU

submits it terminated Bayley's employment because her "work product ha[d] not met the minimum requirements for [her] position" and since the time she successfully completed the PIP she "failed to sustain an acceptable level of job performance, as explicitly called for in the PIP." (Termination Notice, Doc. #30-24, p. 2). The record shows Holland and Watson noted the quality of Bayley's work performance had been decreasing since the 2009-2010 Performance Review. In Bayley's review Watson wrote Bayley's work "would improve if she held herself accountable to a higher standard of excellence," she "sometimes fails to manage her time efficiently," and Bayley needs to "[f]ocus on improving the quality of [her] work. Try to eliminate errors, particularly on work done with the corporate plan." (Bayley's 2009-2010 Performance Review, Doc. #30-9, pgs. 3-4). Watson's evaluation of Bayley's 2009-2010 work performance was further supported by Holland's Performance Review of Watson which stated, "Randy needs to work with Sylvia to make her understand her rol[e] in the Department. Sylvia needs to improve her performance and accuracy on her projects. This is an opportunity for Randy to be a teacher to Sylvia" and "[d]uring the course of the year I will be watching Randy and Sylvia to see if he is working with her to improve her performance." (Watson's 2009-2010 Performance Review, Doc. #30-10, p. 4). Although Bayley expressed disapproval of her 2009-2010 Performance Review by crossing out critical language and providing her own explanation for those comments, Bayley was aware by November 2010 her supervisor considered her work performance was deficient. (See Watson's 2009-2010 Performance Review, Doc. #30-10, p. 5).

The record reflects Bayley was aware her supervisors considered the quality of her work performance was sub-par throughout 2011 and up until her termination on January 18, 2012. After the redistribution of work responsibilities from Wavra to Bayley in May 2011, Watson sent an email to Bayley reminding her that they "have talked about improving the accuracy of [Bayley's] work" and that she should be "[c]oncentrating on the quality of [her] work . . [so that

9

she wouldn't] need to spend time redoing returns and making corrections." (Watson's May 4, 2011, Email to Bayley, Doc. #30-12). Bayley's work performance came under scrutiny again on November 2, 2011, when Watson, Holland, and Taylor placed Bayley on PIP because Bayley was "not meeting the expectations of the Tax Analyst III position . . . [as] evidenced by the number of errors made on [Bayley's] day to day work product." (Bayley's PIP, Doc. #30-18, p. 2). In particular the PIP noted Watson had a file containing seventy-one errors Bayley made dating back to January 2011.[6] Id. After being placed on PIP, Bayley acknowledged she thought her job was in jeopardy. (Bayley's Dep., Doc. #30-3, p. 34, lns. 19-20). While Bayley received a memo on December 5, 2011 recognizing her successful completion of the PIP, the memo also stated, "Please remember, you are expected to maintain this level of performance to meet the expectations of the Tax Analyst III position and if you do not, further disciplinary action up to and including termination will be taken." (Dec. 5, 2011 PIP Memo, Doc. #30-19, p. 2). However, Watson noted that Bayley made at least two mistakes after the PIP and Holland stated in his deposition that "in late December time frame after the Performance Improvement Plan had expired . . . [Bayley's] work slipped back to the same situation it was prior to the Performance Improvement Plan." (Watson's Dep., Doc. #44-2, pgs. 12-13; Holland's Dep., Doc. #44-4, p. 37, lns. 17-21). With Taylor's assistance, Watson and Holland rated Bayley as "marginal" in her 2010-2011 Performance Review which evaluated her work performance over the entire year.

---

[6] In his deposition, Watson characterized Bayley's errors as "mostly just careless – carelessness . . . . not following up on things that didn't look correct, not – I guess not doing the analysis part of the job that she should do when you're in that position, and when something – when something wasn't correct, not following up on what could have caused it. Her job entailed more than just putting a number from one report onto another report, there was analysis work involved in it, and that created some errors. Most of the errors were simple errors done by putting a number in the wrong place from a wrong report . . . ." (Watson's Dep., Doc. #44-2, pgs. 19-20). In general Bayley disagreed that all 71 errors could be attributed solely to her, but she acknowledged that she may have made some errors, including after completing the PIP. (Bayley's Dep., Doc. #30-4, pgs. 14, 24, 39, 190-191, lns. 14, 20-21, 13-23).

(Taylor's Dep., Doc. #44-5, pgs. 25-27; Holland's Dep., Doc. #44-4, pg. 40, lns. 5-15). Bayley received a copy of her 2010-2011 Performance Review on January 13, 2012, and on January 18, 2012, MDU terminated her employment.[7]

The magistrate judge finds the record clearly establishes that Bayley's age was not the 'but-for' cause of her termination because her work performance was not meeting MDU's reasonable expectations for the year and a half leading up to her termination. Therefore, Bayley is unable to prove the third element of the ADEA age discrimination standard.[8] Accordingly, because Bayley fails to prove the third element, the court does not need to address the arguments related to the fourth element.

## 2. Defamation

Bayley submits Holland's and Watson's comments in her 2010-2011 Performance Review constitute defamation because they were false statements that may have been viewed by other co-workers when the review was placed face down on her chair under her desk in her shared cubicle. (Bayley's Dep., Doc. #30-2, pgs. 49-51). Under North Dakota law, defamation is

---

[7] In his deposition, Holland elaborated further on his reason for terminating Bayley's employment, stating "[s]he was not terminated – she was terminated for the history of her job performance for the past year and half, and we – the one-month period where she was on a Performance Improvement Plan her performance did improve, but it regressed very quickly, and that was why she was terminated due to the history of her performance." (Holland's Dep., Doc. # 44-4, p. 44, lns. 2-8).

[8] Although Bayley did not allege an age discrimination claim under North Dakota law, she likewise cannot prevail on a claim under the North Dakota Human Rights Act ("NDHRA"). Similarly to the ADEA, the NDHRA requires Bayley to prove: "(1) membership in a protected class under the Act; (2) satisfactory performance of the duties of the position; (3) an adverse employment decision; and (4) others not in the protected class were treated more favorably." Jacob v. Nodak Mut. Ins. Co., 2005 N.D. 56, ¶ 13, 693 N.W.2d 604.609 (See also Spratt v. MDU Resources Group, Inc., 2011 N.D. 94 ¶¶ 5, 10, 797 N.W.2d 328, 330 (The North Dakota Supreme Court "has adopted a modified version of the federal McDonnell Douglas formula, which creates a presumption and burden of proof in employment discrimination cases.")). For the reasons discussed above, Bayley fails to satisfy the second element under NDHRA requiring a showing of satisfactory performance of the duties of the position.

classified as either libel or slander. N.D.C.C. § 14-02-02. "Libel is a false and unprivileged publication by writing . . . which has a tendency to injure the person in the person's occupation." N.D.C.C. § 14-02-03; Humann v. KEM Elec. Co-op., Inc., 450 F. Supp.2d 1006, 1016 (D.N.D. 2006) aff'd, 497 F.3d 810 (8th Cir. 2007). An actionable claim of libel or slander requires publication which means the allegedly defamatory matter must be communicated to a third party. N.D.C.C. § 14-02-03; Jose v. Norwest Bank North Dakota, N.A., 599 N.W.2d 293, 300 (N.D. 1999). In her deposition, Bayley admitted that she has no evidence demonstrating anyone other than herself, Watson, and Holland viewed her 2010-2011 Performance Review. (Bayley's Dep., Doc. #30-3, p. 51, lns. 2-4; Bayley's Dep., Doc. #30-4, p. 4, lns. 15-17). Because there is no evidence supporting the claim that the alleged defamatory matter was communicated to a third party, Bayley has failed to meet the publication element required for an actionable claim of defamation.

### 3. Retaliation

Bayley has alleged in her complaint and deposition that MDU terminated her employment in retaliation for her criticism of MDU's payment process for tax payments as inefficient. (Doc. #1; Bayley's Dep., Doc. #30-4, p. 51; Bayley's Dep., Doc. #30-5, pgs. 2-4). Bayley has failed to cite any law related to this claim. (See Docs. # 39-1, 53). However, even if Bayley has alleged retaliatory discharge under the North Dakota whistleblower statute, as suggested by the defendant, Bayley's claim would fail. (See Doc. #29, p. 20). To prove a claim of retaliatory discharge under the whistleblower statute, Bayley must demonstrate (1) she engaged in protected activity; (2) MDU took an adverse employment action against her; and (3) a causal link exists between her protected conduct and the adverse employment action. Holmes v. Trinity Health, 729 F.3d 817, 823 (8th Cir. 2013). "An employee engages in protected activity when she reports, in good faith, a violation or suspected violation of federal or state law to her

employer." Id. citing Ambers v. Vill. Family Service. Ctr., Inc., 329 F.Supp.2d 1046, 1052-53 (D.N.D. 2004).

In the instant case, Bayley admitted the activity she reported (i.e. MDU's payment procedure for Cascade) was not illegal but rather just "very inefficient, a waste of company time or resources." (Bayley's Dep., Doc. #30-5, pgs. 3-4; Bayley's Dep., Doc. #30-2, p. 35, lns. 10-11). There is no evidence in the record to indicate Bayley reported MDU's payment procedure because she suspected it was in violation of a federal or state law, or that MDU considered her criticism to be an allegation of illegal activity. Accordingly, Bayley's claim of retaliatory discharge under the North Dakota whistleblower statute should be dismissed.

### 4. Breach of Contract and Breach of Alleged Covenant of Good Faith

Bayley alleges in her complaint that her contract with MDU "included a covenant of good faith that its Policies and Procedures when followed by the employee would not become the basis of termination or sanctions. Plaintiff was terminated for conduct that was not only permitted under these Policies but was actually encouraged." (Doc. #1). In her subsequent briefs, Bayley fails to provide any legal or factual basis for this claim. (See Docs. # 39-1, 53). In her deposition, Bayley acknowledged her employment was "at-will" and that she did not have an employment contract with MDU. (Bayley's Dep., Doc. #30-1, p. 25, lns. 7-12; see also Employment Offer Letter, Doc. 30-7; Termination Notice, Doc. #30-24, p. 2). Later in her deposition when asked "[a]nd your final claim is that there was a breach of contract, but I think you already have acknowledged to me you did not have an employment contract with MDU?" Bayley responded, "Based on the definition at the beginning, no."(Bayley's Dep., Doc. #30-5, p. 4, lns. 17-22). Because Bayley acknowledges she never had a contract with MDU and fails to provide any facts or law to support this claim, Bayley's breach of contract and breach of alleged covenant of good faith claim should be dismissed.

## Conclusion

MDU is entitled to summary judgment on all four claims alleged in Bayley's complaint. Bayley's claim of age discrimination fails because she cannot show her age was the "but for" cause of her involuntary employment termination. Summary judgment is proper concerning Bayley's defamation claim because she failed to prove MDU's alleged defamatory matter was communicated to a third party. Bayley's claim of retaliatory discharge fails because MDU's conduct that she criticized was not in violation of federal or state law. Lastly, MDU is entitled to summary for the claim of breach of an employment contract and covenant of good faith because Bayley admitted she never had a contract with MDU and failed to provide any facts or law to support this claim. Accordingly, it is **RECOMMENDED** defendant's motion for summary judgment (Doc. #28) be **GRANTED** and Bayley's complaint (Doc. #1) be **DISMISSED** with prejudice.

Dated this 14th day of November, 2014.

/s/ *Karen K. Klein*
Karen K. Klein
United States Magistrate Judge

## NOTICE OF RIGHT TO OBJECT

Pursuant to Rule 72(a) and (b), Federal Rules of Civil Procedure, and District of North Dakota Local Court Civil Rule 72.1(D)(2) and (3), any party may object to this Report and Recommendation by filing with the Clerk of Court no later than December 2, 2014, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.